FIDELITY MUT. LIFE INS. CO. *v.* GUESS *et al.*

(*Nashville,* December Term, 1936.)

Opinion filed January 16, 1937.

METCALF, METCALF & APPERSON, of Memphis, for appellant.

MARION G. EVANS and JOHN B. SNOWDEN, II, both of Memphis, for appellee.

MR. CHIEF JUSTICE GREEN delivered the opinion of the Court.

The purpose of this suit was to set aside a marginal release of a trust deed entered of record in the office of the register of Shelby county and to have said trust deed declared in force and a valid subsisting prior lien in favor of complainant on land described. The owners of the equity and the trustees and beneficiary of a subsequent trust deed were made defendants to the suit. The chancellor dismissed the bill and sustained the cross-bill to set up a second trust deed. The decree of the chancellor was affirmed by the Court of Appeals and the complainant, the Fidelity Mutual Life Insurance Company, hereafter called Fidelity, filed its petition for *certiorari,* which was granted.

For many years Fidelity has been lending money on real estate in Memphis. The number of its loans ran from 200 to 300 and the aggregate of these loans was generally over $1,000,000. From 1915 until his death in 1932, T. J. Turley was the loan agent for Fidelity in

that territory. The details of Fidelity's business in Memphis were all transacted through Turley. There were no direct dealings whatever between Fidelity and the borrowers. Turley would negotiate loans and, if they were accepted by Fidelity, he would in its behalf collect interest and principal, look after taxes, repairs, and insurance, grant extensions, and institute foreclosures. Fidelity appeared to have entire confidence in Turley's integrity and discretion and quite uniformly acquiesced in anything he suggested or did in the conduct of its business entrusted to him.

Turley died in July, 1932, leaving his affairs in great confusion. He had represented other lenders of money as loan agent in addition to Fidelity and was found to have perpetrated many frauds similar to the one hereafter described. By reason of these frauds, losses running into hundreds of thousands of dollars will be sustained by parties involved, and much litigation has arisen among these parties to the end that it may be decided where these losses shall fall.

Turley conducted his extensive business through the agency of a corporation known as the Turley-Bullington Mortgage Company during the time he represented complainant. Later the name of the concern was changed to the Turley Mortgage Company after Bullington retired. The record plainly shows that Turley dominated both concerns.

For the present, we shall refer to Turley and his mortgage companies as one and the same entity. We will undertake hereafter to show that such was, in legal effect, true.

The particular controversy before us arises thus: In April, 1923, Turley arranged to lend F. S. Trimble $4,-

000. Trimble executed three notes payable to bearer, one for $200 due in three years, one for $200 due in four years, and one for $3,600 due in five years. To secure these notes Trimble executed a trust deed on Memphis property to T. J. Turley and J. P. Bullington, trustees. A draft was made on Fidelity by Turley for the amount of the loan, Trimble's notes indorsed by Turley, and the notes and trust deed were sent to Fidelity at its home office in Philadelphia. The $200 notes were both paid. The $3,600 note was extended to May 1, 1931. During the pendency of the loan, Trimble sold the property to J. G. Guess and wife, Willa Fryer Guess, and the latter assumed payment of the mortgage debt.

Further facts, not really in controversy, are found by the Court of Appeals as follows:

"On June 1st, 1931, Turley wrote the Fidelity that Guess had applied to another company for a loan and that he expected 'to be able to pay us off in full within the next two weeks;' and on July 14th he wrote that arrangements were being made to take up the loan on August 1st, and asked that 'all papers be forwarded here for collection.' With this letter he enclosed a check for $144.00 to cover the interest to August 1st. On July 20th, the Fidelity forwarded all the papers to Turley with instructions as to closing the transaction, and 'with the understanding that if the loan is not paid off in full on that date or shortly thereafter, they (the documents) are to be returned for our files.'

"In the meantime, on June 17th, Guess and wife had negotiated a new loan through the office of Emmet E. Joyner & Company, and the Title Department of the Bank of Commerce & Trust Company, which examined the title for the new lender, mailed its check for $3735.81

to the Turley-Bullington Mortgage Company to pay off the mortgage of the Fidelity, and this check was deposited by the Turley-Bullington Mortgage Company in its bank account in the usual way; but it did not remit the same to the Fidelity, or advise it that collection had been made. On August 20, 1931, the Turley-Bullington Mortgage Company, by Turley as its president, made a marginal release of the Fidelity trust deed. Thereafter the Fidelity wrote Turley numerous letters asking an explanation of the delay in closing the matter, but these letters he either ignored or answered with false excuses for the delay, making payments to cover the interest as it matured in the meanwhile; and the Fidelity did not learn the truth until it caused an investigation to be made after Turley's death, which occurred on July 14, 1932.

"The $3735.81 remitted to the Turley-Bullington Mortgage Company in payment of the Fidelity note was paid out of the proceeds of the new loan obtained by Guess through Emmet E. Joyner & Company from the Life Insurance Company of Virginia, and other funds provided by Guess. The Fidelity has never received payment from the Turley-Bullington Mortgage Company of any part of the proceeds (principal) of its note; and has never been able to find its note or other papers, although a thorough search has been made for them in the files of the Mortgage Company."

The primary ground upon which Fidelity seeks relief herein is the proposition that, under the circumstances just detailed, Turley was without authority from it to receive payment of the note on June 17, 1931, and consequently without authority to enter the marginal release of the trust deed. Fidelity relies on *Griswold, Hallette*

*& Persons* v. *Davis,* 125 Tenn., 223, 141 S. W., 205, and subsequent decisions of this court that a debtor is not justified in paying the principal debt to an agent of the holder, not expressly authorized to receive such payment, unless the agent has in his possession at the time of payment the securities sought to be paid and makes that fact known to the debtor.

On the other hand, defendants and cross-complainants contend that Turley was a general agent of Fidelity in Memphis with full power to receive payment for Fidelity of any matured indebtedness due it, and with full power to release any lien securing such indebtedness, whether the securities evidencing the indebtedness were in Turley's possession or not. After a review of the evidence the chancellor and the Court of Appeals sustained these contentions.

This particular case does not require so broad a ruling as was made by the courts below.

Regardless of Turley's general authority to bind Fidelity, he was authorized by letter to collect this identical debt for it. The securities which evidenced the debt were sent to him, the debt was paid to him, and after he became the holder of the note for collection, and after the note was paid to him, he released the lien that secured the note.

Does it make any difference that the amount due on the note was paid to Turley before the receipt of the note by him? Can it be said he would have been less likely to misappropriate a payment made to him after the note came into his hands than one made to him before? The note was past due when the payment to Turley was made, and the only reason Turley did not have the in-

strument in his possession then is because he had not up to that time asked that it be sent to him.

In the latest text on Agency, Corpus Juris *Secundum,* vol. 2, p. 1136, it is said:

"Moreover, where an agent receives authority to do a particular act after the agent has actually done such act without authority, the subsequent authority will operate as a ratification of previously done unauthorized act."

The statement in the text is very well sustained by *Rice* v. *McLarren,* 42 Me., 157; *Exchange & Banking Co. of New Orleans* v. *Boyce,* 3 Rob. (La.), 307, and to like effect is *Brown* v. *Aitkin,* 90 Vt., 569, 99 A., 265. In these cases agents, without authority, made sales of property of their principals and performed other acts with respect thereto. Later such agents were given specific authority to do these particular acts by the principals and it was held, as stated, such subsequent authority operated to ratify. In none of the cases did the principals know, at the time the specific authority was given, that the agents had already performed the specific acts.

Fidelity, of course, knew all the relevant facts when it sent the note to Turley for collection, except the fact that the note had already been paid to him. As above suggested, ignorance in this particular does not seem material since Turley would have been just as likely to embezzle the money had it been paid to him after the note reached him.

Aside from the foregoing, there are elements of estoppel apparent on the pleadings and proof in this case which preclude the relief sought by Fidelity. These facts are not set up as an estoppel *eo nomine* but, the

pleadings disclosing the same, they may be noticed. *Maryland Casualty Co.* v. *McTyier*, 150 Tenn., 691, 266 S. W., 767, 48 A. L. R., 1168, and *State* v. *Patterson*, 155 Tenn., 169, 290 S. W., 973.

Fidelity sent its note to Turley before he entered the marginal release of the lien securing the note. It made him, apparently at least, the lawful holder of the instrument, as such entitled to release the lien under Shannon's Code, section 3701. We think defendants were entitled to rely on this release which Fidelity definitely facilitated.

It was held by this court in *W. C. Early Co.* v. *Williams,* 135 Tenn., 249, 186 S. W., 102, L. R. A., 1916F, 418, that there was no active duty resting on the indorsee of a lien note to watch the record to prevent incumbrances from going to record and becoming clouds on his rights thus fixed; that when he invested on a clear title of record he might rest quiescent. The court, however, recognized as a correct statement of the law the following from 2 Jones on Mortgages (7 Ed.), section 976:

"As between a mortgagee whose mortgage has been discharged of record solely through the act of a third party, which act was unauthorized by the mortgagee, and for which he was in no way responsible and a person that has been induced by such cancellation to believe that the mortgage has been canceled in good faith, and has dealt with the property by purchasing the title or accepting a mortgage thereon as security for a loan, the equities are balanced. In such case the rights will be settled in the order of time, and the prior mortgage must remain despite the apparent discharge. If, however, the mortgagee is in any way responsible for the

mortgage being released of record, or if the release of record is procured through the neglect, incaution, credulity, or misplaced confidence of the mortgagee, a different rule will govern in determining the equities."

The proposition stated in the last paragraph of the quotation above is abundantly sustained by authorities collected in 41 C. J., 585. Most of these cases were those in which the fraudulent release was made before the subsequent mortgage was taken. We think there is little difference, however, between a case where an innocent party is misled into taking a subsequent mortgage, and a case in which he is misled into resting upon the priority of a subsequent mortgage. In either case, if the first mortgagee is in any way responsible for the recorded release of his lien, superior equity favors the subsequent mortgagee.

A contention made for Fidelity and very strongly pressed upon the court is that T. J. Turley alone was its agent and that it could not be bound, under any circumstances, by acts of the Turley-Bullington Mortgage Company or other corporation of Turley's.

The chancellor found as follows:

"With reference to the agency of Turley's corporation, it does not appear that any formal contract was entered into in that respect. However, the course of conduct of the Fidelity with reference to the activities of Turley's corporation was such as convinces the Court that the Fidelity knew that the local corporation was assuming to act as its agent and repeatedly ratified such activities and conduct by acquiescence. The receipt of checks for large sums of money drawn by Turley's corporation on local banks, even though enclosed in a letter signed by T. J. Turley, individually, or by someone for

him, is a very strong circumstance to show that the funds belonging to the Fidelity were being collected and handled by the local corporation.''

The Court of Appeals made this finding:

''The overwhelming weight of the evidence is that in his dealings with the public Turley handled the business of the complainant through the agency of his corporations, at first, the Turley Mortgage Company and later, the Turley-Bullington Mortgage Company, and we find that the complainant knew, or certainly was charged with notice that such was the fact. Mr. Quinn and Mr. Sproule made several visits to Memphis and spent several days in Turley's office in the seventeen years he was handling the Fidelity loans in Memphis, and on these visits they had ample opportunity to see that Turley was actually handling the Fidelity business through the agency of his corporation; and the correspondence, and the general course of dealing between them, charges complainant with notice that such was the fact. No better proof of this could be furnished than that all collections made for it were deposited in bank to the account of one or the other of the Turley companies, and all remittances were made to it by checks of said companies.''

██ ██ It is idle to say that there is not in this record substantial evidence to sustain these concurrent findings of the chancellor and of the Court of Appeals, and such findings are under the statute (Code 1932, sec. 10620) binding upon us. Moreover, it appears in the record that in a bill which Fidelity filed in the federal court to procure a receiver for the Turley-Bullington Mortgage Company, the allegation was made ''that as a part of the consideration for the purchase from the defendant (Turley) (Turley-Bullington Mortgage Co.)

of its first mortgage securities . . . the defendant corporation undertook to and did act as a clearing house through which interest and principal payments were made." This bill was sworn to by an official of Fidelity.

While the foregoing does not seem to be pleaded as a judicial estoppel by defendants herein, such an allegation in a sworn bill is none the less an admission of Fidelity's that carries evidential weight. An effort to escape the force of this admission is made by counsel for Fidelity on the ground that it was inconsiderate and inadvised. There is, however, much evidence in ,the record tending to show that the quoted allegation in the federal court bill was an apt description of the part that the Turley-Bullington Mortgage Company played in these transactions. It might be added that the record shows that Turley dominated his corporations. The case is not very different from those that have been before this court in which a party, for his own convenience, conducted his business through a corporation, and in which the court refused to recognize separate identity between such individual and such corporation. *Towles & Co.* v. *Miles,* 131 Tenn., 79, 173 S. W., 439; *Fidelity Trust Co.* v. *Service Laundry Co.,* 160 Tenn., 57, 22 S. W. (2d), 6.

The particular marginal release which Fidelity seeks herein to avoid was, as a matter of fact, made by Turley himself, although in the name of Turley-Bullington Mortgage Company, which latter circumstance does not touch the merits of the case.

It is finally insisted by Fidelity that the marginal release entered by Turley was ineffective because not made according to the provisions of the trust deed. The trust deed provided, if the debt was paid, "the trustees herein named, or either of them, will reconvey the prop-

erty above mentioned and described to the grantors herein at his and said grantors' expense." This provision in the trust deed in no way affects the validity of the marginal release. The provision was for the benefit of the mortgagors. They could have demanded a reconveyance, but if satisfied with the marginal release, that was no concern of Fidelity. In truth, one of Fidelity's officials, testifying herein, said that Fidelity was not particularly interested in the manner in which the releases were made. Shannon's Code, section 3702, authorized a marginal release such as was made herein.

Our attention is called to the fact that the Bank of Commerce & Trust Company, guaranteeing the title, and the subsequent mortgagee, so far as the record shows, did not demand the surrender of Fidelity's note. We think negligence cannot be imputed to them on this account. These defendants were not parties to the note. Their only interest in the matter was to have the lien released, which was done.

For the reasons stated, the decree of the Court of Appeals is affirmed and this bill dismissed.